WETHERELL, J.
The Florida House of Representatives, the Florida Senate, and their respective presiding officers (hereafter “the Legislature”) petition for certiorari review of an order that 1) permits Respondents[1] to depose legislators and legislative staff members regarding the Congressional reapportionment process and 2) requires production of draft reapportionment maps and supporting documents for an in camera review. The Legislature contends that the order departs from the essential requirements of law because it permits discovery of information protected by the legislative privilege recognized by this Court in Florida House of Representatives v. Expedia, Inc., 85 So.3d 517 (Fla. 1st DCA 2012). We agree and therefore quash the challenged order.
On February 9, 2012, the Legislature passed Committee Substitute for Senate Bill 1174 (CS/SB 1174), which established new Congressional districts for the State of Florida based on the 2010 Census (hereafter “the Plan”). On that same date, the “Romo Plaintiffs”[2] filed a complaint in the Circuit Court for Leon County challenging the constitutionality of the Plan. On February 17, 2012, the day after the Governor signed CS/SB 1174 into law,[3] the “Coalition Plaintiffs”[4] filed a separate complaint challenging the constitutionality of the Plan. The cases were consolidated by the trial court.
The complaints, as amended, allege that the Plan as a whole, and a number of *120 individual districts in the Plan,[5] violate the standards in article III, section 20 of the Florida Constitution by impermissibly favoring Republicans and incumbents and by diminishing the ability of racial and language minorities to elect representatives of their choice. The complaints seek an order declaring the entire Plan, or alternatively, the specifically-challenged districts, unconstitutional and enjoining any future elections under the Plan.
The standards in article III, section 20 were added to the Florida Constitution in 2010 by an initiative petition commonly referred to as “Amendment 6” or the “Fair Districts Amendment.” See generally Advisory Op. to Att’y Gen. re Standards for Establishing Legislative Dist. Boundaries, 2 So.3d 175 (Fla.2009) (hereafter “Advisory Op. re Legislative Boundaries ”); Brown v. Sec’y of State, 668 F.3d 1271 (11th Cir.2012). In approving the placement of Amendment 6 on the ballot, the Florida Supreme Court explained that the “overall goal” of the amendment was “[t]o require the Legislature to redistrict in a manner that prohibits favoritism or discrimination, while respecting geographic considerations.” Advisory Op. re Legislative Boundaries, 2 So.3d at 181. Most pertinent to the issue framed by the petition in this case are the standards in article III, section 20(a), which provides in pertinent part that:
No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts 'shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice;....
Art. III, § 20(a), Fla. Const. (emphasis added); see also In re Senate Joint Resolution of Legislative Apportionment 1176, 83 So.3d 597, 617 (Fla.2012) (hereafter “In re Apportionment Law — March 2012 ”) (explaining that the identical language in article III, section 21(a) of the Florida Constitution that governs the drawing of state legislative districts “prohibits intent, not effect”).
In an effort to obtain evidence of the intent underlying the Plan, Respondents served a notice of taking depositions of the Senate Majority Leader, an administrative assistant to the Senate Reapportionment Committee, and the staff director of the House Redistricting Committee. The Legislature filed a motion for a protective order seeking to prevent these depositions and, more broadly, to prohibit the deposition of any legislator or legislative staff member based on legislative privilege. The motion also sought to preclude the discovery of unfiled draft reapportionment maps and any related supporting documents based on legislative privilege and the public records exemption in section 11.0431(2)(e), Florida Statutes (2012).
The trial court granted the Legislature’s motion for protective order in part and denied it in part. The court acknowledged the holding in Expedia, but reasoned that the legislative privilege “must bend somewhat” in this case because of the “compelling, competing government interest” embodied in article III, section 20 requiring “the motive or intent of legislators in drafting the reapportionment plan” to be considered in determining the validity of the plan. The court then distinguished between what it characterized as “subjec *121 tive” and “objective” information — a distinction the court acknowledged “may be difficult to determine in some instances”— and concluded that only the “subjective thought process of legislators and the confidential communication between them and between legislators and their staff’ warranted the full protection of the legislative privilege in this case. Accordingly, the court authorized Respondents to “depose legislators or staff, notwithstanding an assertion of legislative privilege, regarding ‘objective’ information or communication which does not encroach into [their ‘subjective’] thoughts or impressions.”
The trial court determined that this subjective/objective dichotomy also applied to the draft maps and supporting documents the Legislature sought to protect from discovery based on the legislative privilege and section 11.0431(2)(e). However, the court explained that it was not in a position to determine precisely how the public records exemption in that statute applied to the draft maps and supporting documents without additional information “as to their nature and how they compare or contrast with the plan ultimately adopted.” Accordingly, the court directed the Legislature to “produce all documents requested which do not contain ‘subjective’ information [and] to schedule an in camera review as to any disputed documents.”
The Legislature timely filed a petition for writ of certiorari with this Court seeking review of the trial court’s order.
II
A
Certiorari is the appropriate remedy, in limited circumstances, to review a non-final order that is not appeal-able under Florida Rule of Appellate Procedure 9.130. See Bd. of Trs. of Internal Improvement Trust Fund v. Am. Educ.
Enters., LLC, 99 So.3d 450, 454 (Fla.2012). To obtain review by certiorari, the petitioner must establish that the challenged order [1] departs from the essential requirements of law [2] resulting in material injury for the remainder of the case [3] that cannot be corrected on appeal. Id. The latter two elements are jurisdictional and must be considered first. Id. at 454-55.
“Certiorari jurisdiction does not lie to review every erroneous discovery order.” Id. at 456 (quoting Katzman v. Rediron Fabrication, Inc., 76 So.3d 1060, 1062 (Fla. 4th DCA 2011)); see also Martin-Johnson, Inc. v. Savage, 509 So.2d 1097, 1100 (Fla.1987) (noting that “not every erroneous discovery order creates cer-tiorari jurisdiction in an appellate court”) (emphasis in original). However, when the order permits discovery into privileged matters, the resulting harm cannot be remedied on appeal and it is therefore appropriate for the appellate court to exercise' its certiorari jurisdiction to review the order. See Allstate Ins. Co. v. Langston, 655 So.2d 91, 94 (Fla.1995) (explaining that “certain kinds of information ‘may reasonably cause material injury of an irreparable nature,’ ” including “cat out of the bag” information such as that “protected by privilege, trade secrets, work product, or involving a confidential informant”) (quoting Martin-Johnson, 509 So.2d at 1100).
Here, the challenged order authorizes Respondents to depose legislators and legislative staff members on matters protected by the legislative privilege and requires the Legislature to produce potentially privileged documents for an in camera review under an unworkable standard that the trial court itself described as “difficult to determine.” The harm resulting from the order cannot be remedied on appeal because once the depositions are held and the documents are *122 produced, the privilege is lost and the proverbial cat is out of the bag. Accordingly, the Legislature has established the requisite “irreparable harm” necessary to invoke our certiorari jurisdiction.[6]
B
1
On the merits, we begin our analysis with Expedia in which this Court recognized the existence of the legislative privilege. The order at issue in Expedia partially denied a motion to quash a subpoena for deposition issued to a legislator and his aide. See 85 So.3d at 520. Much like the order in this case, the order in Expedia prohibited questions “pertaining to the thoughts, opinions, or legislative activities of the witnesses,” but it allowed the deposition to go forward on several seemingly innocuous facts — i.e., whether the appellee in that case provided the legislator and his aide certain documents and what the legislator and his aide did with the documents once they received them — that would likely be considered “objective” information under the dichotomy adopted by the trial court in this case. Id. Despite the narrow scope of inquiry allowed by the trial court in Expedia, this Court reversed the order authorizing the depositions and directed the trial court to quash the subpoenas. Id. at 519, 525.
The Court explained that the legislative privilege has its roots in both the common law and the separation of powers provision of the Florida Constitution, id. at 522-24, and the Court reasoned that “[t]he power vested in the legislature under the Florida Constitution would be severely compromised if legislators were required to appear in court to explain why they voted a particular way or to describe their process of gathering information on a bill.” Id. at *123 524 (emphasis added). The Court endorsed a “functional test” for determining the scope of the legislative privilege, id. at 525 (citing Kamplain v. Curry Cnty. Bd. of Comm’rs, 159 F.3d 1248, 1251 (10th Cir. 1998), for this proposition), and in so doing, the Court implicitly rejected the subjective/objective dichotomy adopted by the trial court in this case.
Simply put, Expedia held that the legislative privilege broadly protects legislators and legislative staff members from being compelled to testify about any matter that is “an essential part of the legislative process” or pertains to the performance of “a legitimate legislative function.” 85 So.3d at 525; accord Ariz. Indep. Redistricting Comm’n v. Fields, 206 Ariz. 130, 75 P.3d 1088, 1095 (2003) (explaining that the legislative privilege extends to matters beyond speech and debate by legislators “when such matters are an integral part of the deliberative and communicative processes relating to proposed legislation or other matters placed within the jurisdiction of the legislature”) (internal quotations omitted); Holmes v. Farmer, 475 A.2d 976, 984 (R.I.1984) (“Inquiry by the court into the actions or motivations of the legislators in proposing, passing, or voting upon a particular piece of legislation ... falls clearly within the most basic elements of legislative privilege.”) (emphasis added). Thus, using the trial court’s vernacular, the privilege equally protects “subjective” information, such as the legislator’s rationale or motivation for proposing or voting on a piece of legislation, and “objective” information, such as the data or materials relied on by legislators and their staff in the legislative process. Accordingly, the trial court departed from the essential requirements of law when it permitted Respondents to depose legislators and legislative staff members on any matter pertaining to their activities in the reapportionment process.
We have not overlooked the limitation imposed by the trial court on the scope of the depositions, but in addition to its inconsistency with Expedia, we are not persuaded that the proposed objective/subjective dichotomy would be workable. There is no clear demarcation as to what information is “objective” and what information is “subjective,” and even the trial court recognized that “[w]hat is subjective versus objective material may be difficult to determine in some instances.” Indeed, we agree with the Legislature that “[tjhis nebulous standard invites objections, disagreement, refusals to answer questions, hostile depositions, and constant court intervention in discovery disputes — just the sort of time-consuming oppressive intrusion into legislative decision-making that the privilege is designed to prevent.” Moreover, because the legislative record details what individual legislators did in the reapportionment process, it appears that the true purpose of the depositions set by Respondents is to learn why these individuals did what they did, which is precisely the type of information the legislative privilege is intended to protect.
2
The legislative privilege is not absolute, and as recognized in Expedia, there may be situations where “the need for privacy [underlying the privilege] is outweighed by a more important governmental interest.” 85 So.3d at 525. The Court did not articulate in Expedia what interests -might be more important than the legislative privilege, but based on the context of the statement quoted above, it is apparent that the Court was referring to interests outside of the legislative process and unrelated to the importance of the legislation at issue, such as criminal investigations and prosecutions. Id. (citing Gir- *124 ardeau v. State, 403 So.2d 513 (Fla. 1st DCA 1981), for the proposition that “the privilege could not be used to withhold evidence of a crime”); accord United States v. Gillock, 445 U.S. 360, 361, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980) (rejecting state legislator’s claim of legislative privilege in a federal criminal prosecution and noting that the cases applying the privilege “have drawn the line at civil actions”). Accordingly, while we agree with the trial court that the Legislature’s compliance with the standards in article III, section 20 is an important governmental interest, we reject the court’s determination that this interest is sufficient to outweigh the legislative privilege or to afford less protection to “objective” information that falls within the scope of the privilege.
First and foremost, we see nothing in the language of article III, section 20 or its history to suggest that it was intended to abrogate or limit the legislative privilege in any way. The ballot title and summary for Amendment 6 did .not mention the legislative privilege or otherwise suggest that legislators could be compelled to testify on matters pertaining to the reapportionment process. Indeed, the advisory opinion that approved the placement of Amendment 6 on the ballot made clear that the relevant “intent” was that “of the entity that draws the districts.” Advisory Op. re Legislative Boundaries, 2 So.3d at 186 (emphasis added). Thus, the fact that article III, section 20(a) precludes the Legislature, as a body, from drawing districts with certain “intent” does not, as the trial court concluded, justify an inquiry into “the motive or intent of legislators ” in drafting the Plan. Cf. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 268, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (explaining that legislative history was a factor to be considered in determining whether governmental action was motivated by racial animus in violation of the Equal Protection Clause, but noting that testimony of members of the decision-making body regarding their motivations “frequently will be barred by privilege”); Florida v. United States, 886 F.Supp.2d 1301, 1302 (N.D.Fla.2012) (denying motion to compel depositions of legislators and legislative staff members on the basis of legislative privilege even though their testimony might have been marginally relevant to preclearance of the Plan under the Voting Rights Act, and noting that “[a] single legislator’s testimony on the legislator’s own purpose, or a single legislator’s opinion testimony about other legislators’ purpose, may not say much about the actual overall legislative purpose”); In re Perry, 60 S.W.3d 857, 861-62 (Tex.2001) (granting writ of mandamus to preclude plaintiffs in redistrieting case from deposing members of legislative redistricting board and their aides who were cloaked with legislative immunity where plaintiffs had alternative sources for this information, including the legislative record).
It would have been a dramatic change in the law if Amendment 6 abrogated or limited the legislative privilege. The fact that the amendment’s ballot title and summary were silent on the issue is a good indication that such a change was not intended. See Graham v. Haridopolos, 75 So.3d 315, 320 (Fla. 1st DCA 2011), approved, 108 So.3d 597, 2013 WL 362773 (Fla. Jan.31, 2013). Also, it is noteworthy that, according to the supreme court, “at least five other states share a similar constitutional or statutory requirement” prohibiting a reapportionment plan from being drawn with the intent to favor or disfavor political party or incumbents, In Re Apportionment Law—March 2012, 83 So.3d at 615, but Respondents have not cited a single decision from those states (or any other state) authorizing legislators and legislative staff members to be deposed on mat *125 ters pertaining to the reapportionment process. Thus, to paraphrase Chief Justice Roberts,[7] although there is a first time for everything, the fact that deposing legislators in this context has not previously been permitted is a good indication that it is not permissible.
Additionally, the governmental interests embodied in article III, section 20 are no more compelling than the interests embodied in the constitutional provisions guaranteeing equal protection, due process, access to courts, etc. Thus, a balancing of interests that focuses on the importance of the governmental interest or legislative enactment at issue is not workable. On this point, we agree with the Legislature that “disregard[ing] the privilege outside of the criminal context simply because a legislative enactment is ‘important,’ or affects important interests, would stand the privilege on its head, [citation omitted]. The privilege guarantees the Legislature’s independent judgment precisely when it is exposed most to external pressures — in the case of important legislation.”
Having said that, we recognize that in construing the identical language in article III, section 21(a) that governs the drawing of state legislative districts, the supreme court stated that “the focus of the analysis must be on both direct and circumstantial evidence of intent.” In re Apportionment Law—March 2012, 83 So.3d at 617. However, this statement was immediately followed by a cite to Village of Arlington Heights, supra, in which the United States Supreme Court made clear that placing a legislator on the stand is “usually to be avoided” because “judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government.” 429 U.S. at 268 n. 18, 97 S.Ct. 555. Accordingly, we do not view this statement as an implicit authorization for parties challenging a reapportionment plan to depose individual legislators or legislative staff members in the hope that one of them might provide “direct evidence” of the intent underlying the plan enacted by the Legislature as a whole. If that was indeed what the supreme court meant, it will need to say so more clearly.
Finally, we reject Respondents’ argument that precluding them from deposing legislators and legislative staff members will thwart the intent of the Fair Districts Amendment and make it impossible for the trial court to determine whether the Legislature complied with the standards in article III, section 20. This claim rings hollow for several reasons. First, it is undisputed that Respondents have been provided tens of thousands of files from which legislative intent can be gleaned, including the extensive legislative record of the reapportionment process and the materials submitted by the State to the U.S. Department of Justice under the Voting Rights Act. See In re Perry, 60 S.W.3d at 861-62 (precluding depositions of redistricting board members and their aides, which the court characterized as “an almost unprecedented incursion into legislative immunity,” because the plaintiffs had already been provided “a wide array of documentary information ..., including materials the State of Texas submitted to the Department of Justice to support pre-clearance under section 5 of the Voting Rights Act”). Second, Florida law is clear that legislative , intent is to be determined from what the Legislature said (or, here, drew) in the challenged legislation, not after-the-fact statements of individual leg *126 islators as to what they thought or intended when proposing or voting on the legislation. See Sec. Feed & Seed Co. v. Lee, 138 Fla. 592, 189 So. 869, 870 (1939).
We are confident that Respondents will be able to make their case that the Plan was drawn with improper intent — if, indeed, that was what happened — with the evidence in the legislative record and their experts’ analysis of the Plan and its underlying demographic data. Indeed, although we recognize that the court was conducting a “facial” review on an expedited time-frame, we note that the supreme court had no difficulty in. determining whether the state legislative districts drawn by the Legislature complied with the identical standards in article III, section 21 based solely on this type of evidence. See In re Apportionment Law—March 2012, 83 So.3d at 612-13, 615, 628 (explaining that intent to favor or disfavor a political party can be gleaned from “an assessment of statistical analysis, a visual examination of the plans, and an evaluation of legislative history”; the plan’s compliance, or not, with the “tier-two requirements” in article III, section 21(b); and an evaluation of alternative plans); see also In re Senate Joint Resolution of Legislative Apportionment 2-B, 89 So.3d 872, 895-98 (Fla.2012) (Pariente, J., concurring) (questioning whether the intent-based standard in article III, section 21(a) is workable, and suggesting that “partisan imbalance” in a plan may also be an indicator of impermissible intent).
3
For these reasons, we conclude that the trial court departed from the essential requirements of law by allowing Respondents to depose legislators and legislative staff members on matters pertaining to the reapportionment process notwithstanding their claims of legislative privilege. Accordingly, we quash that portion of the order permitting Respondents to depose legislators and legislative staff members.
C
The foregoing analysis also applies to the draft maps and supporting documents the Legislature sought to protect from discovery because, as the trial court implicitly concluded and as Respondents appear to concede,- the legislative privilege applies not only to compelled oral testimony but also to compelled production of written materials that fall within the scope of the privilege. See, e.g., Brown & Williamson Tobacco Corp. v. Williams, 62 F.3d 408, 420 (D.C.Cir.1995) (rejecting the proposition that the Speech and Debate Clause only applies when members of Congress' or their aides are personally questioned because “[djocumentary evidence can Certainly be as revealing as oral communications” and “indications as- to what Congress is looking at provide clues as to what Congress is doing, or might be about to do”); Ariz. Indep. Redistricting Comm’n, 75 P.3d at 1099 (holding that “to the extent the legislative privilege protects against inquiry about a legislative act or communications about that act, the privilege also shields from disclosure documentation reflecting those acts or communications”). Thus, we quash that portion of the trial court’s order extending the unworkable objective/subjective dichotomy to the draft maps and supporting documents.
That, however, does not end our analysis of the issue because Florida has a broad public records law pursuant to which most legislative records are open to the public for inspection and copying, see art. I, § 24(a), Fla. Const.; § 11.0431, Fla. Stat., and it is well-settled that documents that are not statutorily exempt from the public records law cannot be withheld based upon a claim of common law privilege. See Wait v. Florida Power & Light Co., 372 *127 So.2d 420, 428-24 (Fla.1979). Thus, as the Legislature appears to concede, legislative records that do not fall within a statutory exemption cannot be withheld based on a claim of legislative privilege and therefore must be produced in discovery.
Here, in seeking to preclude discovery of draft maps and supporting documents, the Legislature relied on the public records exemption in section 11.0431(2)(e). This statute exempts the following records from public inspection and copying:
A draft, and a request for a draft, of a reapportionment plan or redistricting plan and an amendment thereto. Any supporting documents associated with such plan or amendment until a bill implementing the plan, or the amendment, is filed.
§ 11.0431(2)(e), Fla. Stat. (2012).
The Legislature contends that this exemption protects from public disclosure and discovery any document that “relates to” a draft map that was not filed as a bill or an amendment. Respondents contend that, by virtue of the temporal limitation in the second sentence of the statute, all documents related to the reapportionment process are no longer exempt from public disclosure and must be produced in discovery because such documents were necessarily relied on to support the Plan ultimately adopted by the Legislature.
The trial court did not accept either of these positions, finding the Legislature’s interpretation of the statute too broad and finding Respondent’s interpretation “a little too narrow.” The court indicated that it was unable to determine the precise scope of the exemption as it related to the documents the Legislature sought to protect from discovery without additional information as to how the reapportionment process works and how the draft plans compared to the Plan ultimately adopted by the Legislature. The court suggested that this information could be provided as part of the in camera review of any disputed documents.
We agree with this analysis as far as it goes. The first sentence of section 11.0431(2)(e) exempts from public disclosure in perpetuity draft reapportionment plans, draft amendments, and requests for such drafts. The second sentence exempts the “supporting documents associated with such plan or amendment,” but only until a bill implementing the plan or amendment is filed. The most logical, in pari materia reading of these sentences is that the “supporting documents” for a draft plan or draft amendment remain exempt from public disclosure unless and until the draft for which the documents provide support is filed. Stated another way, if a draft plan or amendment is not filed, it and its “supporting documents” will remain exempt from public disclosure in perpetuity; but, once the draft is filed, it and its “supporting documents” are no longer subject to the statutory exemption.
Accordingly, the initial focus of the in camera review to be conducted by the trial court on remand with respect to any disputed document should be on the question of whether the document is subject to the public records exemption in section 11.0431(2)(e). If the court determines that the document does not fall within the scope of the exemption (e.g., because it is not a “supporting document” for an unfiled draft plan or amendment), then the document must be produced.
If, however, the trial court determines that the document falls within the scope of the exemption, additional inquiry is necessary because the fact that a document is exempt from inspection and copying under the public records law does not mean that the document is not discoverable by a par *128 ty-opponent in litigation unless the document is privileged. See Dep’t of Prof'l Reg. v. Spiva, 478 So.2d 382 (Fla. 1st DCA 1985) (concluding that grade reports that were exempt from disclosure under the Public Records Act were not automatically privileged for purposes of discovery); Dep’t of High. Saf. & Motor Veh. v. Krejci Co., 570 So.2d 1322, 1324 (Fla. 2d DCA 1990) (holding that exemption of driver’s license photographs from public inspection did not preclude their discovery in a civil action); Fla. R. Civ. P. 1.280(b)(1) (“Parties may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter of the pending action _”) (emphasis added). Thus, even if a document falls within the scope of the public records exemption in section 11.0431(2)(e), it will have to be produced in discovery unless it falls within the scope of the legislative privilege or if a balancing of the parties’ interests weighs in favor of keeping the document confidential. See Dep’t of Health v. Poss, 45 So.3d 510, 512 (Fla. 1st DCA 2012) (explaining that the determination as to whether a document that is exempt from the public records must be produced in discovery turns on “the presence or absence of statutory language limiting or defining the types of proceedings in which confidential public records may be disclosed and used, and a balancing of the parties’ interests or competing public polices”). Of course, the trial court has the authority to limit the use and disclosure of any documents produced in discovery that would otherwise be exempt from public disclosure under a statutory exemption. See Fla. R. Civ. P. 1.280(b)(5); Krejci Co., 570 So.2d at 1325 (stating that records subject to an exemption in the Public Records Act “are subject to discovery in a civil action in exceptional circumstances and where the trial court takes all precaution to ensure the confidentiality of the records”).
All of that being said, it is quite possible that the scope of the public records exemption in section 11.0431(2)(e) and the legislative privilege are coextensive such that all documents that are exempt from public disclosure are likewise protected from discovery in this case. However, this cannot be determined until the trial court undertakes the in camera review described above.
For these reasons, although we quash that portion of the order extending the subjective/objective dichotomy to the draft maps and supporting documents the Legislature sought to protect from discovery, we do not disturb the portion of the order requiring an in camera review of such documents before they have to be produced to Respondents.
Ill
In sum, we quash the challenged order insofar as it permits Respondent to depose legislators and legislative staff members concerning the reapportionment process and insofar as it requires production of draft maps and supporting documents for an in camera review under the erroneous, unworkable objective/subjective dichotomy adopted by the trial court. On remand, before ordering the production of any documents withheld by the Legislature pursuant to section 11.0431(2)(e), the trial court shall conduct an in camera review to determine whether such documents fall within the scope of the public records exemption in that statute and, if so, whether the documents fall within the scope of the legislative privilege as explicated in this opinion and Expedia.
PETITION GRANTED; ORDER QUASHED.
MAKAR, J., concurs.
BENTON, C.J., dissents with opinion.

.“Respondents,” as used herein, refers to the plaintiffs below. The Attorney General and the Secretary of State are also Respondents by operation of Florida Rule of Appellate Procedure 9.020(g)(4), but they are defendants below aligned with the Legislature. The Secretary of State filed a response to this Court's order to show cause why the petition for writ of certiorari should not be granted in which he stated that "the petition should be granted.” The Attorney General did not file a response to the order to show cause, nor did the intervenors below, Respondents Florida State Conference of NAACP Branches, Bill Negron, Anthony Suarez, Luis Rodriguez, Father Nelson Pender, N.Y. Nathiri, Mayor Bruce B. Mount, Pastor Willie Barnes, Mable Butler, or Judith A. Wise.

. The Romo Plaintiffs include Respondents Rene Romo, Benjamin Weaver, William Everett Warinner, Jessica Barnett, June Keener, Richard Quinn Boylan, and Bonita Agan.

. See ch. 2012-2, Laws of Fla.

. The Coalition Plaintiffs include Respondents League of Women Voters of Florida, The National Council of La Raza, Common Cause Florida, Robert Allen Schaffer, Brenda Ann Holt, Roland Sanchez-Medina, Jr., and John Steele Olmstead.

. The Romo Plaintiffs and the Coalition Plaintiffs each challenged Districts 5, 10, 13, 14, and the districts surrounding District 5. The Coalition Plaintiffs also challenged Districts 7, 20, 21, 22, 23, 24, 25, 26, and 27.

. We have not overlooked Respondents' argument, echoed by the dissent, that certiorari review of that portion of the order requiring production of the documents the Legislature sought to protect is premature because the trial court stated that it will conduct an in camera review of any disputed documents. See generally Cape Canaveral Hosp., Inc. v. Leal, 917 So.2d 336 (Fla. 5th DCA 2005). We agree with the general principle underlying this argument, but in this case, we conclude that review of the entire order is justified at this time as a result of the directive in the order requiring immediate production of "all documents requested which do not contain ‘subjective’ information,” coupled with the unworkable objective/subjective dichotomy adopted by the trial court and issues of comity between coordinate branches of government implicated by the order. As to the dissent’s claim that the Legislature would suffer no harm — irreparable or otherwise — if the depositions of one senator and two legislative staff members were allowed to go forward, we disagree for several reasons: first, the trial court’s order, by its terms, is not limited to the three depositions that have been noticed, but rather more broadly establishes the parameters pursuant to which Respondents may depose any legislator or legislative staff member despite their claims of legislative privilege; second, as discussed in Part II.B infra, the scope of inquiry permitted by the order encompasses matters that are clearly protected from compelled disclosure by the legislative privilege; and third, although the dissent correctly notes that the appendix did not include evidence supporting the assertion in the petition that Respondents "indicated that more depositions [of legislators and legislative staff] would follow," Respondents did not dispute this assertion in their responses to the petition or in response to this Court's questions at oral argument. On the latter point, despite Respondents’ assurances at oral argument they are not planning "an endless parade of depositions” and that they "will never line up 61 legislators and ask them hours and hours of questions,” we are convinced that if this Court does not intervene at this time and the three noticed depositions are allowed to go forward under the parameters set by the trial court, not only will the cat be out of the bag, but the camel's nose will be under the tent and more depositions of legislators will be set and the legislative privilege will be rendered meaningless in this case.

. See Nat'l Fed'n of Indep. Bus. v. Sebelius, — U.S. —, —, 132 S.Ct. 2566, 2586, 183 L.Ed.2d 450 (2012).