MARSTILLER, J.,
dissenting.
As a member of the three-judge panel of this court whose decision on the merits of this appeal is being vacated solely to certify the orders at issue to the Florida Supreme Court, I respectfully dissent.
I.
The panel reviewed two related circuit court orders compelling the appellants, a political consulting group and its employees who are not parties to the litigation below, to disclose communications protected by the First Amendment associational privilege, and permitting use of the privileged information at trial. The second of the two orders was entered on the eve of trial, and the appellants moved for an emergency stay of the orders from this Court, which we granted. Because the circumstances required an expeditious decision on the merits— trial was underway — the panel issued a dispositive order reversing the trial court’s orders, notifying the parties that a written opinion would follow. The panel simultaneously denied the plaintiff-appellees’ motion to lift the stay and alternative suggestion to certify the orders under review as requiring immediate resolution by the supreme court, filed just, as the panel prepared to issue the dispositive order.
Before the panel could publish the opinion explaining its decision, however, two things happened. An internal request to consider the case en banc was filed. And shortly thereafter, the supreme court, using its “all writs” jurisdiction, see article V, section 3(b)(7), Florida , Constitution, “stayed” the dispositive order. See League of Women Voters of Fla. v. Data Targeting, Inc., No. SC14-987, 2014 WL 2186202 (Fla.2014). In so doing, the supreme court permitted admission of the appellants’ privileged information into evidence at trial, “subject to a proper showing of relevancy,” but directed the trial court to “maintain the confidentiality of the documents by permitting any disclosure or use only under seal of the court and in a courtroom closed to the public.” Id. at 9. By using its “all writs” power in this instance, the supreme court intended to preserve its jurisdiction over this case pending issuance of the panel opinion which likely would establish the independent grounds for its ultimate jurisdiction. See Fla. Senate v. Graham, 412 So.2d 360, 361 (Fla.1982) (“[W]e have the jurisdiction conferred by article V, section 3(b)(7), to issue all writs necessary to the complete exercise and in aid of the ultimate jurisdiction imposed [elsewhere in the constitution].”).[1]
Notwithstanding the supreme court’s apparent expectation that the panel would issue its opinion, and the undoubted expectation of the parties, the trial court and the public that the panel’s opinion was forthcoming, five judges of this court, who constitute an en banc majority because six judges are recused from this case, now vacate the panel’s dispositive order because they believe the panel should have *224 passed the case through to the supreme court.
Florida Rule of Appellate Procedure 9.125 is the mechanism by which to invoke the supreme court’s discretionary jurisdiction under article V, section 3(b)(5), of the Florida Constitution; to review trial court orders the district courts of appeal otherwise have jurisdiction to review. Under the rule, a district court'may certify “any order or judgment of a trial court ... to require immediate resolution by the supreme court because the issues pending in the district court are of great public importance or have a great effect on the proper administration of justice throughout the state.” Fla. R.App'. P. 9.125(a) (emphasis added).
First, vacating the panel’s dispositive order to employ this rule en banc seems, at best, unnecessary when the order was stayed and supreme court review of the panel’s decision was all but guaranteed. Indeed, but for the internal request for en banc consideration, the panel by now would have issued its opinion and the supreme court’s review surely would have commenced.
Second, the orders at issue in this case resolve a third-party discovery dispute over specific documents and communications in which the third parties, who are non-parties to the litigation below, claim a First Amendment privilege. The question of whether, in the first instance, the appellants were entitled to First Amendment protection has not been properly raised for review.[2] Thus, the narrow issue in this appeal is whether the plaintiff-appellees,[3] who seek to invalidate the congressional district apportionment plan and the revised Senate legislative redistricting plan[4] the Florida Legislature adopted in 2012, met their burden under the stringent standard articulated in Perry v. Schwarzenegger, 591 F.3d 1147 (9th Cir.2010), to permit them access to and use of the appellants’ constitutionally-protected communications at trial.[5] And as more fully explained infra, the test set forth in Perry is a case-by-case balancing test, the outcome of which turns on the particular facts of a given case. It therefore was not unreasonable for the panel to conclude that the discovery issue is not one needing immediate resolution by the supreme court. Even if the panel had been called upon to decide whether the First Amendment privilege applies, that, too, is not necessarily an issue requiring pass-through to the supreme court. Florida’s district courts of appeal routinely decide, via three-judge panel, constitutional questions and myriad other complex matters. This is what we do. See Art. V, § 4(a), Fla. Const. (“There shall be a district court of appeal serving each appellate district.... Three judges shall consider each case and the concurrence of two shall be necessary to a decision.”).
Finally, the fact that the lawsuits underlying this appeal challenge legislatively- *225 adopted apportionment plans does not elevate the case-specific discovery issue here to one of great public importance requiring immediate review by the supreme court— ultimate review, perhaps, but not certification and pass-through review. The panel’s decision on the merits would not have created a bright-line rule of law limiting discovery availability in future lawsuits of this type. It bears pointing out that in a prior appeal arising from these lawsuits, a different three-judge panel of this court considered the hefty issue of whether legislators and their staff were immune from testifying about matters pertaining to their activities in the reapportionment process— a constitutional issue whose resolution would affect all such future lawsuits. Yet, this court did not convene en banc to wrest the case from the panel and certify the trial court’s order to the supreme court. Rather, the case proceeded as it should, with a decision by the assigned panel that, in turn, was reviewed by the supreme court. See Fla. House of Representatives v. Romo, 113 So.3d 117 (Fla. 1st DCA), quashed sub -nom League of Women Voters of Fla. v. Fla. House of Representatives, 132 So.3d 135 (Fla.2013). I see no meaningful, objective distinction between Romo and the instant appeal that would justify the action taken by the en banc majority here, especially because supreme court review of the panel’s decision was a virtual certainty.[6]
II.
Although I disagree with the en banc decision, it is now the decision of this court. Nevertheless, I believe the parties and the public still deserve the long-awaited explanation for the panel’s now-vacated May 22, 2014, dispositive order.
The plaintiff-appellees commenced declaratory actions in Leon County Circuit Court seeking to invalidate the Legislature’s 2012 congressional district apportionment plan and revised Senate legislative apportionment plan. The consolidated lawsuits were brought under article III, sections 20 and 21, of the Florida Constitution, which prohibit the Legislature from drawing congressional and legislative apportionment plans or individual districts to intentionally favor or disfavor any political party or incumbent, or to hinder any minority group from being able to elect representatives of their choice. The gravamen of the lawsuits is that the Legislature, with the intent proscribed by sections 20 and 21, collaborated behind the scenes with Republican “political operatives” to create discriminatory apportionment plans that were ultimately enacted.
During discovery, the plaintiff-appellees served subpoenas duces tecum on the appellants asking for “[a]ny communication with any person about (1) congressional or [state] senate redistricting in Florida in 2012; and (2) congressional or state senate redistricting maps (whole or partial, completed or draft) that were submitted to or discussed with any legislator, legislative staff members, or any legislators, staff member, or committee.” In response, the appellants produced their communications with legislators and legislative staff, but filed a motion for protective order, asserting that the remaining communications contained trade secrets and also were protected by the First Amendment associational privilege. They further asked for in camera review of more than 1,800 pages of documents potentially responsive to the subpoenas. The trial court appointed former Florida Supreme Court Justice Major B. Harding as special master to conduct the in camera review and to hold a hearing on the issues raised.
*226 Following the hearing and document review, the special master entered a report concluding:
• The subpoenaed information was largely contained in email messages exchanged internally between employees of Data Targeting, Inc.
• Some of the email exchanges were between Data Targeting employees and one or more individuals at the Republican Party of Florida, for whom Data Targeting provided consulting services under contract.
• Consistent with appellant Pat Bain-ter’s testimony at the hearing, the email communications reflected typical activities undertaken by Data Targeting political consultants, including evaluating and analyzing district-level voting performance.
• The subpoenaed communications are protected by the First Amendment associational privilege, [7] and the appellants had satisfied the first prong of Perry v. Schwarzenegger, 591 F.3d 1147 (9th Cir.2010) by making a prima facie showing of the chilling effects that disclosure of the protected information would cause.
• The plaintiff-appellees failed to show a compelling need sufficient to justify denying the appellants protection of the constitutional privilege.
• Having reached these two conclusions, there was no need to address the trade secrets issue.
In a March 20, 2014, order, the trial court adopted the special master’s conclusions that the subpoenaed information is entitled to First Amendment protection, and that the appellants had satisfied the chilling-effects prong under Perry. But the court postponed ruling on whether the plaintiff-appellees had overcome the appellants’ constitutional privilege, stating, “The second prong of the Perry analysis requires me to balance the competing interests to determine whether the [First Amendment associational] privilege should yield. Such analysis will require me to review the documents in camera ... to determine which, if any, specific documents should be provided to Plaintiffs despite the associational privilege asserted by the non-parties.”
On May 2, 2014, the trial court issued its second order on the special master’s report (the first of the two orders now on appeal) directing the appellants to hand over to the plaintiff-appellees a specified subset — totaling 538 pages — of the disputed documents, and designating the documents confidential, only to be viewed by the plaintiff-appellees’ counsel and retained expert. The court stated it would “provide further guidance ... regarding how any of the privileged Produced Data Targeting Documents may be used at the trial in this case at the pre-trial conference scheduled for Friday, May 9, 2014[.]” Notably, the court provided no explanation for its decision to order the documents produced, except to say:
The Court has completed its review in camera of the Data Targeting Documents and performed the balancing test required under the second prong of the Perry v. Schwarzenegger, 591 F.3d 1147 (9th Cir.2010) analysis to determine *227 whether the associational privilege of the Data Targeting Documents should yield. The Court has also considered Non-Parties’ assertion of trade secret protection. Based on the Court’s review, balancing and analysis, the Court finds that the associational privilege of certain of the Data Targeting Documents should yield and shall be produced to Coalition Plaintiffs[.]
There is no official transcript in the record provided to this court evidencing what occurred at the May 9 pre-trial conference. However, on May 15, 2014, the trial court entered a subsequent order (the second of the two orders now on appeal) deeming all the documents produced as a result of the May 2, 2014, order confidential pursuant to Florida Rule of Judicial Administration 2.420. The court further ruled:
To preserve the confidentiality granted by this Order, the Confidential Documents shall be kept confidential as previously ordered by this Court unless and until any of the Confidential Documents is submitted to the Court as evidence in the trial of this case. The proceedings of this Court shall remain open during use of the Confidential Documents by any party at trial. At such time as any of the Confidential Documents is offered as an exhibit in witness examination or entered into evidence in the trial of this case, the exhibit itself, if admitted into evidence, shall be sealed as confidential and not subject to disclosure.
When the trial court refused to stay the May 15 order to prevent use of the documents at trial so the appellants could appeal the May 2 and May 15 orders, the appellants sought, and. obtained, an emergency stay from this court.
The question of whether the circuit court correctly determined that the appellants’ established First Amendment privilege must yield involves “ ‘an application of law to fact ... subject to de novo review.’ ” Varela v. Bemachea, 917 So.2d 295, 298 (Fla. 3d DCA 2005) (quoting Slaughter v. State, 830 So.2d 955, 957 (Fla. 1st DCA 2002)).
“[T]he First Amendment safeguards an individual’s right to participate in the public debate through political expression and political association.” McCutcheon v. Federal Election Comm’n, — U.S. —, —, 134 S.Ct. 1434, 1448, 188 L.Ed.2d 468 (2014). As to political association, the First Amendment protects our freedom to gather in association for the purpose of advancing shared political beliefs, and the Fourteenth Amendment protects this freedom of association from state infringement. See Democratic Party of U.S. v. Wisconsin, 450 U.S'. 107, 121, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981) (citing Kusper v. Pontikes, 414 U.S. 51, 57, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973)); see also NAACP v. Alabama, 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (“It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the ‘liberty’ assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.”). In the litigation context, requests for discovery potentially implicate a party’s First Amendment freedom of association. “Although the First Amendment does not normally restrict the actions of purely private individuals, the amendment may be applicable in the context of discovery orders, even if all of the litigants are private entities,” because a trial court’s order compelling discovery “provide[s] the requisite governmental action that invokes First Amendment scrutiny.” Grandbouche v. Clancy, 825 F.2d 1463, 1466 (10th Cir.1987). “A- party who objects to a discovery request as an in *228 fringement of the party’s First Amendment rights is in essence asserting a First Amendment privilege.” Perry, 591 F.3d at 1160 (emphasis in original); see NAACP, 357 U.S. at 462 (recognizing a party may claim potential violation of First Amendment freedom of association in defense of compelled disclosure during discovery).
Courts employ a two-part framework to a claim of First Amendment privilege by a party objecting to a discovery request. First, the objecting party must make a prima facie showing that disclosure of the requested information will result in “chilling” consequences to the party’s associational rights. Perry, 591 F.3d at 1160. If the objecting party makes this showing, the burden shifts to the requesting party to “ ‘demonstrated an interest in obtaining the disclosures it seeks ... which is sufficient to justify the deterrent effect ... on the free exercise ... of [the] constitutionally protected right of association.’ ” Id. at 1161 (quoting NAAC.P, 357 U.S. at 463). To carry this burden, the party seeking disclosure must demonstrate that (1) “the information sought is highly relevant to the claims or defenses in the litigation,” (2) the request is “carefully tailored to avoid unnecessary interference with protected activities,” and (3) the information sought is otherwise unavailable. Id. The highly-relevant standard is decidedly more demanding than the relevance standard applied to typical discovery requests. See id.; Fla. R. Civ. P. 1.280(b)(1) (“Parties may obtain discovery-regarding any matter, not privileged, that is relevant to the subject matter of the pending action ... if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.”). Rather, the information sought must go “to the heart of the matter.” Silkwood v. Kerr-McGee Corp., 563 F.2d 433, 438 (10th Cir.1977). Ultimately, the court balances the burdens that disclosing the information would impose on the objecting party’s First Amendment rights against the requesting party’s asserted interest in disclosure to determine whether the interest outweighs the harm. Perry, 591 F.3d at 1161. “This balancing may take into account, for example, the importance of the litigation ...; the centrality of the information sought to the issues in the case ...; the existence of less intrusive means of obtaining the information ...; and the substantiality of the First Amendment interests at stake[.]” Id.
The special master concluded that the appellants sustained their burden under Perry to make a prima facie showing that disclosing the communications at issue would have chilling effects on their First Amendment freedom of association. The trial court adopted the special master’s conclusion, and the plaintiff-appellees did not timely seek review of the order adopting that conclusion or file a cross-appeal. Thus, the only reviewable issue is whether the plaintiff-appellees have carried their burden under Pen~y to demonstrate an interest sufficient to justify the harm disclosing the privileged communications would cause the appellants.
The provisions in article III of the Florida Constitution on which the plaintiff-ap-pellees’ lawsuits are based provide, in pertinent part:
SECTION 20. Standards for establishing congressional district boundaries. — In establishing congressional district boundaries:
(a) No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to par-
*229 ticipate in the political process or to diminish their ability to elect representatives of their choice; and districts shall consist of contiguous territory.
[[Image here]]
SECTION 21. Standards for establishing legislative district boundaries. — In establishing legislative district boundaries:
(a) No apportionment plan or district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and districts shall consist of contiguous territory.
Art. Ill, §§ 20(a), 21(a), Fla. Const. The standards are thus identical for congressional and legislative district apportionment. Importantly, “[t]he language of article III, section 20(a) [and section 21(a)] explicitly places legislative ‘intent’ at the center of the litigation.” League of Women Voters of Fla. v. Fla. House of Representatives, 132 So.3d 135, 147 (Fla.2013). The provisions “outlaw[] improper partisan and discriminatory intent in the redistricting process.” Id. at 148. Specifically, the provisions outlaw “improper legislative ‘intent’ ” in the ... reapportionment process. Id. at 147 (emphasis added). “[T]he voters clearly intended for the Legislature to be held accountable for violating the Florida Constitution and to curb unconstitutional legislative intent in [the] reapportionment processes.” Id. at 151.
The gravamen of the plaintiff-appellees’ lawsuits is that the Legislature, with the requisite improper intent, collaborated behind the scenes with Republican “political operatives” to create discriminatory apportionment plans. However, the constitutionally-protected documents the plaintiff-appellees sought in discovery, and now desire to use at trial, are private internal communications with no obvious connection to the central issue in this case, i.e., whether the Legislature drew districts with impermissible intent. None of the requested communications at issue here was sent to or received from any legislator or legislative staffer; neither do they reveal directives from anyone in or working for the Legislature.,[9] Therefore, the information is not highly relevant to matters at issue in the lawsuits, which is the standard under Perry.
In the brief they filed in this court, the plaintiff-appellees asserted that they do not desire the documents to prove the non-parties’ intent (despite also stating “the only people whose intent is on trial are the members, staffers, agents, and collaborators of the Legislature who were involved in the preparation of the adopted redistricting plans.”). Rather, they want to prove the non-parties collaborated with legislators to conceal the true origins of some proposed apportionment plans submitted by members of the public for the Legislature’s consideration. Even so, absent a showing of more than a speculative connection between the appellants’ privileged internal communications and the claims raised in the lawsuits, the communications are not “highly relevant” to matters being litigated.[10] Whatever the *230 privileged information shows, it shows no collaboration between the non-parties and the Legislature. The appellants’ privileged communications do not go to the heart of the matter — legislative intent— and therefore, do not satisfy the stringent highly-relevant standard set forth in Perry.
The plaintiff-appellees .also relied on the following passage in League of Women Voters to support their contention that the appellants’ constitutionally-protected communications are highly relevant to the litigation:
In [In re Senate Joint Resolution of Legislative Apportionment 1176, 83 So.3d 597 (Fla.2012) ], we acknowledged the Legislature for engaging in extensive public hearings as indicative of an unprecedented transparent reapportionment process.... However, if evidence exists to demonstrate that there was an entirely different, separate process that was undertaken contrary to the transparent effort in an attempt to favor a political party or an incumbent in violation of the Florida Constitution, clearly that would be important evidence in support of the claim that the Legislature thwarted the constitutional mandate.
We ... emphasize that this Court’s first obligation is to give meaning to the explicit prohibition in the Florida Constitution against improper partisan or discriminatory intent in redistricting,
The existence of a separate process to draw the maps with the intent to favor or disfavor a political party or an incumbent is precisely what the Florida Constitution now prohibits. This constitutional mandate prohibiting improper partisan or discriminatory intent in redistricting therefore requires that discovery be permitted to determine whether the Legislature engaged in actions designed to circumvent the constitutional mandate.
League of Women Voters, 132 So.3d at 149. It must be noted, however, League of Women Voters solely concerned whether a legislative privilege exists in Florida, and if so, whether the privilege protects legislators from being deposed in lawsuits brought under article III, section 20, of the Florida Constitution.[11] The First Amendment rights of non-parties was not at issue. The supreme court held that the legislative privilege must yield in order to effectuate the intent of the constitutional provision. League of Women Voters, 132 So.3d at 154. Prudence and judicial restraint require construing the supreme court’s statements in League of Women Voters strictly within the context of the issues that were before that court. As such, the policy reasons given to justify piercing legislative privilege do not necessarily also justify abrogating an individual’s First Amendment freedom of association — particularly an individual who is not a party to the lawsuit.[12]
*231 Even if the reasoning applied, the plaintiff-appellees still would have to satisfy the Perry requirements. Based on the particular circumstances of this case and the record provided to this court the plaintiff-appellees failed to demonstrate that the appellants’ communications, protected by the First Amendment associational privilege and evincing no communication with any legislator or legislative staff member, are highly relevant to the lawsuits challenging the 2012 apportionment maps.
They further have not establishéd that the constitutionally-protected information they requested is unavailable from another source. They previously have obtained not only fully-discoverable communications between the appellants (among other political consultants) and particular legislators and/or legislative staffers on the subject of apportionment, but also volumes of publicly available legislative email messages. See, e.g., League of Women Voters, 132 So.3d at 148-49 (“The challengers assert that documents they have so far uncovered, primarily through third-party discovery, reveal direct, secret communications between legislators, legislative staff members, partisan organizations, and political consultants. In addition, because of Florida’s broad public records laws, the challengers have received 16,000 e-mails, including e-mails between legislators and legislative staff, as part of the discovery process.”). Some email messages indicate that political consultants provided input to the Legislature on apportionment maps before they were publicly published. Moreover, the plaintiff-appellees have deposition testimony from witnesses acknowledging that meetings took place between key legislators and staff and other political consultants to discuss apportionment and, notably, how the consultants could participate in the redistricting process in light of sections 20 and 21. Therefore, to the extent the plaintiff-appellees seek to obtain the appellants’ constitutionally-protected information to prove collaboration between legislators and outside partisan operatives, and that a behind-the-scenes process was conducted in an attempt to favor or disfavor a political party, such information has been produced and is otherwise available to them.[13]
■ The question then becomes whether the plaintiff-appellees have demonstrated an interest in the constitutionally-protected communications at issue “sufficient to justify the deterrent effect” disclosing the information will have on appellants’ First Amendment rights. The significance of these lawsuits, which seek to ensure an apportionment process that promotes equal opportunity for all voters to choose their congressional and legislative representatives, is unquestioned. However, also at stake here is the appellants’ freedom of association, guaranteed by the United States Constitution, and the demonstrated harm that disclosing their privileged communications would have on that freedom. The plaintiff-appellees have not established that the requested communications go the heart of the central issue being litigated — mere relevance is not enough— or, importantly, that needed information is *232 unavailable from other sources. Balancing these factors as required under Perry, the plaintiff-appellees’ interest in the privileged information does not outweigh the harm that would result from disclosure. Accordingly, the trial court’s May 2, 2014, order ruling that the privilege must yield to allow the plaintiff-appellees access to the appellants’ documents, and the May 15, 2014, order permitting use of the documents at trial, should be reversed.[14]

. The supreme court's opinion makes several references to our "forthcoming opinion" or “forthcoming decision,” see slip opinion at 4, 7, 8, and its likely jurisdiction to review this decision, see id. at 8 ("In order to ... preserve this Court's ability to completely exercise the eventual jurisdiction it is likely to have to review the First District’s deci-sion_”).

. The plaintiff-appellees did not appeal or cross-appeal that ruling by the trial court. See Fla. R.App. P. 9.110(g); see also Philip J. Padovano, Florida Appellate Practice, § 23.9, at 494 (2011-2012 ed.) ("[T]he filing of a notice of cross appeal is a prerequisite to a claim of error by the appellee.”).

. For purposes of this appeal, the defendants in the litigation below are designated as ap-pellees.

. The Florida Supreme Court invalidated the initially-adopted Senate apportionment plan. See In re Senate Joint Resolution of Legislative Apportionment 1176, 83 So.3d 597 (Fla.2012).

. Appellants also put forth a trade secrets argument. Contrary to media reports, the panel did not base its decision on trade secrets because the trial court did not appear to have directly addressed that argument below.

. I am under no illusion the panel’s opinion would have survived supreme court review.

. The report did not set forth a full analysis on the associational privilege, but referred to an earlier report in which the special master reached the same conclusion regarding information subpoenaed from another non-party who is not an appellant in the instant appeal. The prior special master’s order is not included in the record provided to this court. This is of no consequence, however, because the trial court adopted the special master's conclusion as to the documents at issue in this appeal, and plaintiff-appellees did not cross-appeal that ruling. See supra, note 2.

. Because the documents and communications still, at this point, enjoy First Amendment privilege, it is not appropriate to provide specific descriptions of the matters discussed therein.

. If, as it appears, the plaintiff-appellees’ objective is to impute to the Legislature, alleged partisan and discriminatory intent on the part of the non-party appellants, they presented no authority for such a proposition, and an appellate court should be exceedingly hesitant, *230 in the absence of such authority, to trample the First Amendment rights of non-parties to this litigation so that plaintiff-appellees can test this legal theory.

. The supreme court framed the issue thusly:
Does enforcement of the explicit prohibition in the Florida Constitution against partisan political gerrymandering and improper discriminatory intent in redistricting outweigh a claim of absolute legislative privilege? Specifically the issue presented to the Court is whether Florida state legislators and legislative staff members have an absolute privilege against testifying as to issues directly relevant to whether the Legislature drew the 2012 congressional apportionment plan with unconstitutional partisan or discriminatory "intent.” See art. Ill, § 20(a), Fla. Const.
League of Women Voters, 132 So.3d at 137 (emphasis in original).

.. The foundational policy consideration articulated by the supreme court is that article III, section 20(a), expresses the voters’ desire *231 for more judicial scrutiny of the apportionment process conducted by the legislative branch. See League of Women Voters, 132 So.3d at 148.

. Indeed, in the plaintiff-appellees' own answer brief filed in this court, they assert that "[t]he Produced Documents, if allowed to be used at trial, would provide further evidence of the Legislature’s collaboration with partisan operatives.” (Emphasis added.) Submitting additional evidence with the intention of bolstering evidence that is already otherwise available does not meet the stringent test set forth in Perry and does,not provide a basis for overcoming the strict protection afforded to privileged First Amendment speech.

. Although the appellants produced the constitutionally-protected documents as ordered on May 2, that fact did not moot the May 2 order because it is the basis for the May 15 order permitting the plaintiff-appellees to use the documents at trial.