PARIENTE, J.
Does enforcement of the explicit prohibition in the Florida Constitution against partisan political gerrymandering and improper discriminatory intent in redistricting outweigh a claim of an absolute legislative privilege? Specifically, the issue presented to the Court is whether Florida state legislators and legislative staff members have an absolute privilege against testifying as to issues directly relevant to whether the Legislature drew the 2012 congressional apportionment plan with unconstitutional partisan or discriminatory “intent.” See art. Ill, § 20(a), Fla. Const.
This Court is charged with the solemn obligation to ensure that the constitutional rights of its citizens are not violated and that the explicit constitutional mandate to outlaw partisan political gerrymandering and improper discriminatory intent in redistricting is effectively enforced. While *138 the Legislature asserts that the challengers should be precluded from accessing relevant discovery information because it is absolutely privileged, we conclude that there is no unbending right for legislators and legislative staff members to hide behind a broad assertion of legislative privilege to prevent the discovery of relevant evidence necessary to vindicate the explicit state constitutional prohibition against unconstitutional partisan political gerrymandering and improper discriminatory intent.
This Court has held, in interpreting the constitutional redistricting “intent” standard, that “the focus of the analysis must be on both direct and circumstantial evidence of intent.” In re Senate Joint Resolution of Legislative Apportionment 1176 (Apportionment I), 83 So.3d 597, 617 (Fla.2012). Further, this Court has stated that “there is no acceptable level of improper intent.” Id. As Chief Judge Benton aptly observed in his dissenting opinion to the First District Court of Appeal’s decision below, “[t]he enactment of article III, section 20 of the Florida Constitution makes plain that how and why the Legislature redistricts is a matter of paramount public concern.” Fla. House of Reps. v. Romo, 113 So.3d 117, 131 (Fla. 1st DCA 2013) (Benton, C.J., dissenting).
In this opinion, we decide for the first time that Florida should recognize a legislative privilege founded on the constitutional principle of separation of powers, thus rejecting the challengers’ assertion that there is no legislative privilege in Florida. We also hold, however, that this privilege is not absolute where, as in this case, the purposes underlying the privilege are outweighed by the compelling, competing interest of effectuating the explicit constitutional mandate that prohibits partisan political gerrymandering and improper discriminatory intent in redistricting. We therefore reject the Legislature’s argument that requiring the testimony of individual legislators and legislative staff members will have a “chilling effect” among legislators in discussion and participation in the reapportionment process, as this type of “chilling effect” was the precise purpose of the constitutional amendment outlawing partisan political gerrymandering and improper discriminatory intent.
We also unequivocally reject the dissent’s hyperbolic assertion that our decision “grievously violates the constitutional separation of powers,” dissenting op. at 156, by recognizing a legislative privilege but concluding that it is not absolute as to enforcing this explicit constitutional mandate. To the contrary, we strike the appropriate balance between respecting the separation of powers and fulfilling' this Court’s obligation to uphold the citizens’ explicit constitutional protection against partisan political gerrymandering and improper discriminatory intent in redistricting.
Accordingly, we quash the First District’s decision in Florida House of Representatives v. Romo, 113 So.3d 117 (Fla. 1st DCA 2013), which erroneously afforded legislators and legislative staff members the absolute protection of a legislative privilege. We approve the circuit court’s order permitting the discovery of information and communications, including the testimony of legislators and the discovery of draft apportionment plans and supporting documents, pertaining to the constitutional validity of the challenged apportionment plan. Further, we emphasize that the circuit court is not constrained by this opinion from considering, as discovery proceeds, how a specific piece of information protected by the privilege fits into the balancing approach set forth in this opinion.
*139 FACTS AND BACKGROUND
In February 2012, the Florida Legislature approved the decennial plan apportioning Florida’s twenty-seven congressional districts, based on population data derived from the 2010 United States Census. Soon after its adoption, two separate groups of plaintiffs filed civil complaints in circuit court, which were later consolidated, challenging the constitutionality of the plan under new state constitutional redistricting standards approved by the Florida voters in 2010 and now enumerated in article III, section 20, of the Florida Constitution. Those standards, governing the congressional reapportionment process, appeared on the 2010 general election ballot as “Amendment 6” and, together with their identical counterparts that apply to legislative reapportionment (“Amendment 5”), were generally referred to as the “Fair Districts” amendments.[1] All together, these “express new standards imposed by the voters clearly act as a restraint on legislative discretion in drawing apportionment plans.” Apportionment I, 83 So.3d at 599.
The Florida Constitution’s Redistricting Standards
Article III, section 20, of the Florida Constitution prohibits the Legislature from drawing an apportionment plan or individual district “with the intent to favor or disfavor a political party or an incumbent” and “with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice.” Art. Ill, § 20(a), Fla. Const. Specifically, this constitutional provision provides in its entirety as follows:
In establishing congressional district boundaries:
(a) No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and districts shall consist of contiguous territory.
(b) Unless compliance with the standards in this subsection conflicts with the standards in subsection (a) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.
(c) The order in which the standards within subsections (a) and (b) of this section are set forth shall not be read to establish any priority of one standard over the other within that subsection.
Art. Ill, § 20, Fla. Const.
In interpreting the identical standards in article III, section 21,[2] during its initial *140 2012 review of the legislative apportionment plan, this Court explained that the requirement that “[n]o apportionment plan or district shall be drawn with the intent to favor or disfavor a political party or an incumbent” is “a top priority to which the Legislature must conform during the redistricting process.” Apportionment I, 83 So.3d at 615. This Court stated that “by its express terms, Florida’s constitutional provision prohibits intent, not effect, and applies to both the apportionment plan as a whole and to each district individually.” Id. at 617.
Because “redistricting will inherently have political consequences,” this Court explained that “the focus of the analysis must be on both direct and circumstantial evidence of intent.” Id. In reviewing the objective evidence before it, this Court held that “the effects of the plan, the shape of district lines, and the demographics of an area are all factors that serve as objective indicators of intent.” Id. Moreover, as to the intent to favor or disfavor an incumbent, this Court stated that “the inquiry focuses on whether the plan or district was drawn with this purpose in mind,” and as to objective indicators of intent to favor or disfavor a political party, these “can be discerned from the Legislature’s level of compliance with our own constitution’s tier-two requirements, which set forth traditional redistricting principles.” Id. at 618.
In reviewing these factors to assist this Court in discerning circumstantial evidence of intent, however, this Court was mindful that it was unable to engage in fact-finding. See id. at 612 & n. 13 (noting that the sole type of information available was “objective data” and refusing to consider an expert affidavit); see also In re Senate Joint Resolution of Legislative Apportionment 2-B (Apportionment II), 89 So.3d 872, 893 (Fla.2012) (Pariente, J., concurring) (“Working within a strict time period, this Court is realistically not able to remand for fact-finding, which creates concerns that are compounded by the fact that the Court is constrained to the legislative record that is provided to it.”). Indeed, in Florida House of Representatives v. League of Women Voters of Florida (Apportionment III), 118 So.3d 198, 207 (Fla.2013), this Court subsequently explained that its decisions in Apportionment I and AppoRionment II were “based solely on objective evidence and undisputed facts in the limited record before the Court.” This Court also highlighted the need for judicial review of fact-intensive claims in order to effectuate the intent of the voters, who “clearly desired more judicial scrutiny” of apportionment plans, “not less.” Id. at 205.
The Current Dispute
In the consolidated circuit court lawsuit challenging the validity of the 2012 congressional apportionment plan under the Florida Constitution’s redistricting *141 standards, the challengers[3] allege that the congressional apportionment plan and numerous individual districts violate the article III, section 20, standards by im-permissibly favoring Republicans and incumbents, by intentionally diminishing the ability of racial and language minorities to elect representatives of their choice, and by failing to adhere to the requirement that districts be compact and follow existing political and geographical boundaries where feasible. The challengers seek both a declaratory judgment invalidating the entire plan, or at least the specific districts challenged, as well as a permanent injunction against conducting any future elections using the congressional district boundaries established by the 2012 apportionment plan.
As part of ongoing pretrial civil discovery — and specifically in an effort to uncover and demonstrate alleged unconstitutional partisan or discriminatory intent in the congressional apportionment plan — the challengers sought information from the Legislature and from third parties regarding the 2012 reapportionment process. From third-party discovery, the challengers uncovered communications between the Legislature and partisan political organizations and political consultants, which they allege reveal a secret effort by state legislators involved in the reapportionment process to favor Republicans and incumbents in direct violation of article III, section 20(a). The challengers have also taken deposition testimony from numerous third-party witnesses as to their involvement in the redistricting process and their communications with state legislators and legislative staff members, and have been provided with e-mail communications between legislators and legislative staff, as well as other public records from the Legislature.
In order to further develop and discover evidence concerning their claim of unconstitutional legislative intent in violation of article III, section 20(a), the challengers served a notice of taking depositions of the then-state Senate Majority Leader, an administrative assistant to the Senate Reapportionment Committee, and the staff director of the House Redistricting Committee. Thereafter, the Legislature filed a “Motion for Protective Order Based on Legislative Privilege,” in which it requested the circuit court to enter an order “declaring that (i) no legislators or legislative staff may be deposed, and (ii) unfiled legislative draft maps and supporting documents are not discoverable.” The Legislature’s motion for a protective order was filed in direct response to the challengers’ notice of taking depositions; however, the Legislature sought to more generally prevent the depositions of any legislators and legislative staff, as well as the “discovery of legislatively drawn draft redistricting plans that were never filed as bills.”
The circuit court granted in part and denied in part the Legislature’s motion for a protective order. The circuit court determined that, although a legislative privilege exists in Florida, the privilege is not absolute and “must be balanced against other compelling government interests.” Finding it “difficult to imagine a more compelling, competing government interest than that represented by the [challengers’] claim,” the circuit court drew a distinction between “subjective” thoughts or impressions of legislators and the thoughts or impressions shared with legislators by staff or other legislators, and “objective” information or communication that “does not encroach” into those thoughts or im *142 pressions. (Emphasis added.) In drawing this distinction, the circuit court observed that “there are some categories of information and communications that are most in need of the protection offered by the privilege and some that are less in need of such protection.”
Accordingly, because “the motive or intent of legislators in drafting the reapportionment plan is one of the specific criteria to be considered when determining the constitutional validity of the plan,” and because the information sought by the challengers “is certainly relevant and probative of intent,” the circuit court held that all “objective” information or communications “should not be protected by the privilege.” However, the circuit court cautioned that any individual legislators or legislative staff members who assert a claim of legislative privilege “shall not be deposed regarding their ‘subjective’ thoughts or impressions or regarding the thoughts or impressions shared with them by staff or other legislators.” The circuit court also determined that the same dichotomy applied to the production of documents. It therefore ordered the Legislature to produce all requested documents that do not contain “subjective” information and to schedule an in camera review as to any disputed documents.
On a petition for a writ of certiorari to review the circuit court’s non-final order, the First District, relying on its prior decision in Florida House of Representatives v. Expedia, Inc., 85 So.3d 517 (Fla. 1st DCA 2012), which was the first published Florida case to explicitly recognize the existence of a legislative privilege in Florida, concluded that the circuit court’s order departed from the essential requirements of law when it allowed the challengers to depose legislators and legislative staff members “on any matter pertaining to their activities in the reapportionment process.” Romo, 113 So.3d at 123. The First District reasoned that the legislative privilege “equally protects ‘subjective’ information, such as the legislator’s rationale or motivation for proposing or voting on a piece of legislation, and ‘objective’ information, such as the data or materials relied on by legislators and their staff in the legislative process.” Id. Thus, the First District quashed the circuit court’s order “insofar as it permits [the challengers] to depose legislators and legislative staff members concerning the reapportionment process and insofar as it requires production of draft maps and supporting documents for an in camera review under the erroneous, unworkable objective/subjective dichotomy.” Id. at 128.
Chief Judge Benton dissented, observing in part that “[p]artisan political shenanigans are not ‘state secrets,’ ” and that, at this stage of the litigation, “it is impossible to say that any question [the challengers] would actually have asked would be objectionable.” Id. at 130-31 (Benton, C.J., dissenting). Subsequently, after both groups of challengers in the consolidated litigation below sought review, we exercised our discretion to accept jurisdiction to review the First District’s decision because that decision expressly affects a class of constitutional officers — namely, legislators — and because this Court has never considered whether a legislative privilege exists, which is clearly an important issue to resolve. See art. V, § 3(b)(3), Fla. Const.
ANALYSIS
The questions we confront require this Court to interpret the Florida Constitution to determine whether a legislative privilege exists and to define the parameters of that privilege as applied in this case. These are pure questions of law that are subject to de novo review.
*143 We hold, first, that a legislative privilege exists in Florida, based on the principle of separation of powers codified in article II, section 3, of the Florida Constitution. However, we conclude that this privilege is not absolute and may yield to a compelling, competing interest. We then proceed to review whether a compelling, competing interest exists in this case. Finally, we explain why we embrace the circuit court’s balancing approach at this stage of the litigation, which determined that the compelling, competing constitutional interest present here outweighs the purposes underlying the privilege, therefore allowing discovery but retaining the right of an individual legislator or legislative staff member to assert the privilege as to his or her thoughts or impressions or the thoughts or impressions shared with legislators by staff or other legislators.
I. Florida’s Legislative Privilege
The challengers contend that this Court should not recognize a legislative privilege because the Florida Constitution lacks a Speech or Debate Clause, which is the constitutional provision upon which the legislative privilege is traditionally premised. This clause, which generally states that legislators shall in all cases except treason, felony, or breach of the peace, not be questioned in any other place for any speech or debate in either legislative chamber,[4] is the general justification that the federal courts and other states with a state-specific clause have utilized in recognizing the legislative privilege. See City of Pompano Beach v. Swerdlow Lightspeed Mgmt. Co., 942 So.2d 455, 457 (Fla. 4th DCA 2006) (“The federal courts which have acknowledged and applied the privilege have done so based largely on the Speech and Debate Clause in Article I, section 6, of the United States Constitution, which protects federal legislators from suits.”); Kerttula v. Abood, 686 P.2d 1197, 1205 (Alaska 1984) (applying Alaska’s state constitutional version of the Speech or Debate Clause to preclude the deposition of a state legislator).
In contrast to the vast majority of states, the Florida Constitution does not include a Speech or Debate Clause and has not included one since the clause was omitted during the 1868 constitutional revision.[5] In fact, Florida is one of only two states in the country that lacks either a state constitutional Speech or Debate Clause or a provision protecting legislators from arrest during legislative session.[6]
Coupled with the absence of a Speech or Debate Clause in the Florida Constitution is the presence of Florida’s broad constitutional right of access to public records, set forth in article I, section 24, and right to transparency in the legislative process, codified in article III, section 4. Specifically regarding the Legislature, the Florida Constitution mandates as follows:
[A]ll prearranged gatherings, between more than two members of the legislature, or between the governor, the president of the senate, or the speaker of the house of representatives, the purpose of which is to agree upon formal legislative action that will be taken at a subsequent *144 time, or at which formal legislative action is taken, regarding pending legislation or amendments, shall be reasonably open to the public.
Art. Ill, § 4(e), Fla. Const. Further, article I, section 24(a), which “specifically includes the legislative” branch, provides that “[e]very person has the right to inspect or copy any public record made or received in connection with the official business of any public body” of the state. Art. I, § 24(a), Fla. Const.
Thus, the absence of a Speech or Debate Clause and the strong public policy, as codified in our state constitution, favoring transparency and public access to the legislative process, are factors weighing against recognizing a legislative privilege in Florida. Florida statutes also do not provide for a legislative privilege.[7] Further, any common law legislative privilege has been abolished by a provision in the Florida Evidence Code providing that Florida law recognizes only privileges set forth by statute or in the state or federal constitutions.[8]
These factors, however, are not conclusive because there is another important factor that weighs in favor of recognizing the privilege — the doctrine of separation of powers. It is through this separate and important constitutional principle, which is codified in article II, section 3, of the Florida Constitution, that we recognize a legislative privilege under Florida law.
Forty states, including Florida, have a specific state constitutional provision recognizing the separation of powers between the three branches of government.[9] Article II, section 8, of the Florida Constitution, which is Florida’s separation of powers provision, provides as follows:
The powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein.
Art. II, § 3, Fla. Const.
In Expedia, which was the first published case to analyze and recognize the existence of a legislative privilege in Florida, the First District concluded that the state constitutional separation of powers provision provides an independent basis to recognize a legislative privilege under Florida law. 85 So.3d at 524. The issue in Expe- *145 dia was whether a legislator and a member of the legislator’s staff could be deposed in tax-related litigation so that a party in the lawsuit could “refute a claim that it had waived the attorney-client privilege” as to several documents the legislator had obtained. Id. at 525. The First District held that the legislator and his aide were entitled to assert a legislative privilege against the compelled testimony and that there was no compelling interest in seeking the depositions because the party seeking them was “attempting to refute a fact that has not yet been proven, and, as it appears from this record, may never be proven.” Id.
Although Expedia was the first published Florida case to explicitly conclude that state legislators may assert a legislative privilege, various Florida circuit courts have, in unpublished orders over the years, quashed subpoenas requesting the testimony of state legislators or legislative staff members for various reasons. For example, in 2008, a circuit court quashed a subpoena seeking to elicit the intent, purpose, or motive behind a particular state senator’s introduction of certain amendments to a 2002 piece of legislation. See Order Granting Motion to Quash, Billie v. State, No. 02-499-CA (Fla. 17th Cir.Ct. Feb. 7, 2008). None of these orders specifically analyzed the legislative privilege, however, and most have been premised on the tenet that an individual legislator’s testimony as to individual intent is usually irrelevant in a typical lawsuit challenging a statute. These orders nevertheless support the premise that the judicial branch has respected the separation of powers between the three branches of government, particularly where no compelling interest in seeking the testimony has been demonstrated.
Such respect between the three branches is inherent in our democratic system of government. This Court has previously described the constitutional tenet of separation of powers as “[t]he cornerstone of American democracy,” Bush v. Schiavo, 885 So.2d 321, 329 (Fla.2004), and has explained that article II, section 3, which is the state constitutional separation of powers provision, “encompasses two fundamental prohibitions. The first is that no branch may encroach upon the powers of another. The second is that no branch may delegate to another branch its constitutionally assigned power.” Chiles v. Children A, B, C, D, E, & F, 589 So.2d 260, 264 (Fla.1991). Indeed, as pointed out by several former presiding officers of the Legislature in their amicus curiae brief filed in this case, “the legislative privilege is critical to a proper separation of powers, upon which our system of government is built.”[10]
Accordingly, because of the role that the principle of separation of powers plays in the structure of Florida’s state government, as embodied in article II, section 3, of our state constitution, we reject the challengers’ contention that there is no legislative privilege in Florida and hold that state legislators and legislative staff members do possess a legislative privilege under Florida law. This privilege is based on the principle that “no branch may encroach upon the powers of another,” Chiles, 589 So.2d at 264, and on inherent principles of comity that exist between the coequal branches of government. In other words, “the privilege can be said to derive from the supremacy of each branch within *146 its own assigned area of constitutional duties.” United States v. Nixon, 418 U.S. 683, 705, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).
Several reasons support recognition of a legislative privilege. The most obvious is the practical concern of protecting the integrity of the legislative process by not unnecessarily interfering with the Legislature’s business. As the circuit court cogently articulated, “[l]egislators could not properly do their job if they had to sit for depositions every time someone thought they had information that was relevant to a particular court case or administrative proceeding.” In addition, other reasons for recognizing a privilege include the “historical policy ... of protecting disfavored legislators from intimidation by a hostile executive” and protecting legislators “from the burdens of forced participation in private litigation.” Kerttula, 686 P.2d at 1202. These other policies undergirding the legislative privilege aim to ensure that the separation of powers is maintained so that the Legislature can accomplish its role of enacting legislation in the public interest without undue interference.
Although separation of powers principles require deference to the Legislature in refusing to provide compelled testimony in a judicial action, we emphasize that the legislative privilege is not absolute. As the United States Supreme Court has noted in determining that the President of the United States does not enjoy an absolute privilege of immunity from judicial process in all circumstances, “when the privilege depends solely on the broad, undifferentiated claim of public interest ... a confrontation with other values arises.” Nixon, 418 U.S. at 706, 94 S.Ct. 3090. This public interest component is especially true in Florida, where one of our state constitutional values is a strong and well-established public policy of transparency and public access to the legislative process, which is enshrined in the Florida Constitution.
Indeed, the proposition that a legislative privilege is not absolute, particularly where another compelling, competing interest is at stake, is not a novel one. For example, in United States v. Gillock, 445 U.S. 360, 369, 372, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980), the Supreme Court acknowledged the need to avoid unnecessary intrusion by the executive or judicial branches into the “affairs of a coequal branch,” as well as the Court’s “sensitivity to interference with the functioning of state legislators.” However, the Court concluded nevertheless that “although principles of comity command careful consideration, ... where important federal interests are at stake, as in the enforcement of federal criminal statutes, comity yields.” Id. at 373, 100 S.Ct. 1185. The Court stated as follows:
We recognize that denial of a privilege to a state legislator may have some minimal impact on the exercise of his legislative function; however, similar arguments made to support a claim of Executive privilege were found wanting in United States v. Nixon, 418 U.S. 683 [94 S.Ct. 3090, 41 L.Ed.2d 1039] (1974), when balanced against the need of enforcing federal criminal statutes. There, the genuine risk of inhibiting candor in the internal exchanges at the highest levels of the Executive Branch was held insufficient to justify denying judicial power to secure all relevant evidence in a criminal proceeding. See also United States v. Burr, 25 F.Cas. 187 (No. 14,694) (C.C.Va.1807). Here, we believe that recognition of an eviden-tiary privilege for state legislators for their legislative acts would impair the legitimate interest of the Federal Government in enforcing its criminal stat *147 utes with only speculative benefit to the state legislative process.
Id. While the interest implicated in this case is not the enforcement of the criminal laws, this ease involves the vindication of an explicit constitutional prohibition against partisan political gerrymandering and a constitutional restraint on the Legislature’s actions — a public interest that is also compelling.
As the First District itself has recognized, there may be a compelling, competing interest in a particular case that outweighs the purposes underlying the privilege. See Expedia, 85 So.3d at 525. When the legislative privilege is asserted, therefore, courts must engage in an inquiry to determine both if the privilege applies to protect the particular information being sought and the reason the information is being sought.[11] This inquiry is a two-step process.
The first step is to determine whether the information sought falls within the scope of the privilege. This is an important determination because, for example, information concerning evidence of a crime would not be covered by the legislative privilege. For purposes of our analysis in this case, however, we assume that all of the information being sought by the challengers, which relates to functions undertaken by legislators and legislative staff during the course of their legitimate legislative duties, would fall within the scope of the privilege. We therefore proceed to the next step.
Once a court determines that the information being sought is within the scope of the legislative privilege, the court then must determine whether the purposes underlying the privilege — namely, the deference owed by each coequal branch of government to the others and the practical concerns of legislators’ abilities to perform their legislative functions free from the burdens of forced participation in private litigation — are outweighed by a compelling, competing interest. With this in mind, we next address the compelling, competing interest asserted in this case. Then, we analyze whether this compelling, competing interest outweighs the purposes underlying the privilege.
II. The Compelling, Competing Interest
The compelling, competing interest in this case is ensuring compliance with article III, section 20(a), which specifically outlaws improper legislative “intent” in the congressional reapportionment process. The language of article III, section 20(a), explicitly places legislative “intent” at the center of the litigation. Indeed, as the circuit court succinctly stated, it is “difficult to imagine a more compelling, competing government interest” than the interest represented by the challengers’ article III, section 20(a), claims. The circuit court explained this finding as follows:
[The challengers’ claim] is based upon a specific constitutional direction to the Legislature, as to what it can and cannot do with respect to drafting legislative reapportionment plans. It seeks to pro *148 tect the essential right of our citizens to have a fair opportunity to select those who will represent them. In this particular case, the motive or intent of legislators in drafting the reapportionment plan is one of the specific criteria to be considered when determining the constitutional validity of the plan. The information sought is certainly relevant and probative of intent. Frankly, if the compelling government interest in this case does not justify some relaxing of the legislative privilege, then there’s probably no other civil case which would.
The first-tier requirements in article III, section 20, provide that “[n]o apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent.” Art. Ill, § 20(a), Fla. Const. We recently explained that, in enacting these constraints on the Legislature’s reapportionment of congressional and state legislative districts, “the framers and voters clearly desired more judicial scrutiny” of the apportionment plans, “not less.” Apportionment III, 118 So.3d at 205. Indeed, as this Court has previously noted, “[t]he new requirements dramatically alter the landscape with respect to redistricting by prohibiting practices that have been acceptable in the past.... By virtue of these additional constitutional requirements, the parameters of the Legislature’s responsibilities under the Florida Constitution” and therefore the scope of judicial review of the validity of an apportionment plan “have plainly increased, requiring a commensurately more expanded judicial analysis of legislative compliance.” Apportionment I, 83 So.3d at 607.
Although the dissent relies heavily on the historical roots of the legislative privilege and the United States Supreme Court’s decision in Tenney, 341 U.S. 367, 71 S.Ct. 783, Tenney was “a civil action brought by a private plaintiff to vindicate private rights.” Gillock, 445 U.S. at 372, 100 S.Ct. 1185. Specifically, the issue in Tenney was whether an individual plaintiff could maintain a cause of action for monetary damages against members of the California state legislature’s “Fact-Finding Committee on Un-American Activities” after the committee held a hearing that the plaintiff alleged was designed “to intimidate and silence [him] and deter and prevent him from effectively exercising his constitutional rights of free speech and to petition the Legislature.” Tenney, 341 U.S. at 369, 371, 71 S.Ct. 783.
The compelling, competing interest in this case is a far cry from the interests implicated in Tenney. Unlike the plaintiff in Tenney, the challengers seek not to vindicate private rights, but to determine whether the Florida Legislature violated an explicit constitutional provision outlawing improper partisan and discriminatory intent in the redistricting process. The challengers do not seek monetary damages, but instead challenge whether the congressional districts in which citizens exercise their fundamental democratic right to elect representatives of their choice were drawn in compliance with the Florida Constitution.
In order to fully effectuate the public interest in ensuring that the Legislature does not engage in unconstitutional partisan political gerrymandering, it is essential for the challengers to be given the opportunity to discover information that may prove any potentially unconstitutional intent. The challengers assert that documents they have so far uncovered, primarily through third-party discovery, reveal direct, secret communications between legislators, legislative staff members, partisan organizations, and political consultants. In addition, because of Florida’s broad public records laws, the challengers have received 16,000 e-mails, including e-mails be *149 tween legislators and legislative staff, as part of the discovery process.[12] Contrary to the Legislature’s argument, the fact that the challengers have already discovered communications between legislators and legislative staff, as well as between legislators, legislative staff members, and outside political consultants, related to the congressional apportionment plan, at least in part because Florida’s strong public records constitutional provision requires it, does not make the depositions sought any less important to the critical issue of intent that is the focus of the challengers’ article III, section 20(a), claims.
If the Legislature alone is responsible for determining what aspects of the reapportionment process are shielded from discovery, the purpose behind the voters’ enactment of the article III, section 20(a), standards will be undermined. As we recently stated in connection with our decision to allow a fact-based challenge to the legislative apportionment plan to proceed in circuit court, the failure to permit factual inquiry and the development of a factual record in circuit court proceedings would allow
the Legislature to circumvent the constitutional standards regarding “intent to favor or disfavor a political party or an incumbent” by concealing evidence of that intent from the public, knowing full well that discovery of any documents demonstrating this unconstitutional intent would never be reviewed by a court. While we do not suggest that this occurred during the 2012 redistricting process, these are the exact types of claims that must be subject to a fact-finder’s scrutiny.
Apportionment III, 118 So.3d at 211.
In Apportionment I, we acknowledged the Legislature for engaging in extensive public hearings as indicative of an unprecedented transparent reapportionment process. See Apportionment I, 83 So.3d at 664 (“We commend the Legislature for holding multiple public hearings and obtaining public input.”); see also id. at 637 n. 35 (noting that the Legislature held twenty-six hearings at different locations around the state, during which the public had the opportunity to provide recommendations for the legislative and congressional apportionment plans). However, if evidence exists to demonstrate that there was an entirely different, separate process that was undertaken contrary to the transparent effort in an attempt to favor a political party or an incumbent in violation of the Florida Constitution, clearly that would be important evidence in support of the claim that the Legislature thwarted the constitutional mandate.
We reject the approach of the dissenting opinion, which contends that a broad claim of an absolute legislative privilege should prevent this discovery, and emphasize that this Court’s first obligation is to give meaning to the explicit prohibition in the Florida Constitution against improper partisan or discriminatory intent in redistricting. The existence of a separate process to draw the maps with the intent to favor or disfavor a political party or an incumbent is precisely what the Florida Constitution now prohibits. This constitutional mandate prohibiting improper partisan or discriminatory intent in redistricting therefore requires that discovery be permitted to determine whether the Legislature engaged in actions designed to circumvent the constitutional mandate.
Additionally, the compelling, competing constitutional interest in this ease is corn- *150 pletely unlike any competing interests implicated in a traditional lawsuit challenging a statutory enactment, where a court looks to determine legislative intent through statutory construction. Specifically, the Legislature argues that intent in a statutory enactment is best revealed through the actual language used and any applicable legislative history, rather than through the testimony of individual legislators regarding their subjective intentions in proposing, amending, or voting for or against a particular piece of legislation. See, e.g., Heart of Adoptions, Inc. v. J.A., 963 So.2d 189, 198 (Fla.2007) (stating the general principle of statutory construction that “legislative intent is determined primarily from the statute’s text”). In this context, however, the “intent” standard in the specific constitutional mandate of article III, section 20(a), is entirely different than a traditional lawsuit that seeks to determine legislative intent through statutory construction.
This Court has explained that the “intent” standard “applies to both the apportionment plan as a whole and to each district individually,” and that “there is no acceptable level of improper intent.” Apportionment I, 83 So.3d at 617. Thus, the communications of individual legislators or legislative staff members, if part of a broader process to develop portions of the map, could directly relate to whether the plan as a whole or any specific districts were drawn with unconstitutional intent.
As another court has explained in evaluating a similar claim, “[t]his is not ... ‘the usual “deliberative process” case in which a private party challenges governmental action ... and the government tries to prevent its decision-making process from being swept up unnecessarily into [the] public [domain].’ ” Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections, No. 11-C-5065, 2011 WL 4837508, at *8 (N.D.Ill.2011) (quoting United States v. Bd. of Ed. of City of Chicago, 610 F.Supp. 695, 700 (N.D.Ill.1985)). Instead, “the decisionmaking process ... [itself] is the case.” Id. The same court also noted that cases concerning voting rights, “although brought by private parties, seek to vindicate public rights” and are, in this respect, “akin to criminal prosecutions.” Id. at *6.
Therefore, this case is completely distinguishable from the various circuit court orders and cases outside the reapportionment context from other jurisdictions cited by the Legislature that have quashed subpoenas of legislators or legislative staff members where the testimony of an individual member of the Legislature was not directly relevant to any issue in the case. This case is also readily distinguishable from the First District’s decision in Expe-dia, where the party seeking to depose a member of the Legislature and a legislative aide was “attempting to refute a fact that ha[d] not yet been proven and ... may never be proven” by seeking to ask a question to which the parties had already acknowledged the answer. Expedia, 85 So.3d at 525. Unlike Expedia and other disputes not directly involving the Legislature, the lawsuit brought by the challengers seeks to vindicate the public interest in ensuring that unconstitutional partisan political gerrymandering by the Legislature itself did not occur.
Having concluded that this case presents a compelling, competing interest against application of an absolute legislative privilege, we now address the critical issue of whether this interest outweighs the purposes underlying the privilege.
III. The Balancing Approach
In this case, the circuit court determined that the legislative privilege does not shield most information or communications regarding the congressional apportionment process, but does protect the thoughts or *151 impressions of individual legislators and legislative staff members at this stage of the litigation. We embrace the circuit court’s balancing approach. We conclude that the compelling, competing constitutional interest in prohibiting the Legislature from engaging in unconstitutional partisan political gerrymandering outweighs the purposes underlying the legislative privilege as to all discovery, except to the extent that the circuit court protected the thoughts or impressions of individual legislators or legislative staff at this stage of the litigation. This is not a bright line, however, and involves a balancing of interests as specific questions are posed and additional discovery information is received in this case. The circuit court therefore is not constrained by this opinion from considering, as discovery proceeds, how a specific piece of information protected by the privilege fits into this balancing approach.
Although the Legislature, as well as the former legislative presiding officers in their amicus curiae brief, assert that a “chilling effect” will result if legislators are compelled to testify in this ease, we reject this argument. In doing so, we emphasize that this case is wholly unlike the traditional lawsuit challenging a statutory enactment, where the testimony of an individual legislator is not relevant to intent in statutory construction and there are few, if any, compelling, competing interests weighing against application of the privilege.
Further, we observe that the major “chilling effect” asserted by the former presiding officers would be the alleged reluctance of legislators to meet with constituents to discuss private or intimate matters in fear of those private conversations becoming public.[13] This example is obviously a far cry from this case, which involves nothing less than the public’s interest in ensuring compliance with a constitutional mandate in a process this Court has described as “the very bedrock of our democracy.” Apportionment I, 83 So.3d at 600.
To the extent the Legislature and the former presiding officers assert that there will be a “chilling effect” among legislators in discussion and participation as to future apportionment plans, this type of “chilling effect” was the explicit purpose of the constitutional amendment imposing the article III, section 20(a), redistricting standards — to prevent partisan political gerrymandering and improper discriminatory intent. Indeed, if in fact there was a separate, secret process undertaken by the Legislature to create the 2012 congressional apportionment plan in violation of the article III, section 20(a), standards, the voters clearly intended for the Legislature to be held accountable for violating the Florida Constitution and to curb unconstitutional legislative intent in this and future reapportionment processes.
We also reject the Legislature’s argument that this Court should apply an absolute privilege and preclude the discovery sought because all courts that have considered this issue have precluded similar discovery. First, we note that this Court has never had the occasion to specifically consider whether a legislative privilege exists in Florida and to delineate its boundaries, and, as we have explained, Florida stands *152 apart from many other states in lacking a constitutional Speech or Debate Clause.
Second, although the Legislature has made a point of arguing that no court anywhere has ever allowed a legislator to be deposed regarding the legislative process outside of the criminal context, the Legislature also has candidly admitted that no court in a state with a constitutional provision similar to Florida’s, which explicitly prohibits improper intent or purpose in redistricting,[14] has ever addressed this particular issue. Thus, despite the Legislature’s claim that no court in any of these states has ever permitted the compelled testimony of a state legislator, no court in any of these states has ever expressly prohibited it either. In other words, there is no precedent on this issue in the narrow context of a constitutional provision that explicitly prohibits improper legislative intent in redistricting.
To say, as the dissent does, that our decision stands alone “in the recorded history of our Republic” in compelling legislators to be interrogated “in a civil case concerning their legislative activities,” dissenting op. at 156, fails to take into account that this case is unlike any other “civil” case involving the legislative privilege. In contrast to traditional civil cases, this case concerns an issue of first impression involving an explicit state constitutional prohibition against partisan political gerrymandering and improper discriminatory intent.
We likewise reject the dissent’s reliance on a single case decided by a federal district court judge, who determined the scope of the federal legislative privilege in the context of preclearance review under the Federal Voting Rights Act. See Florida v. United States, 886 F.Supp.2d 1301, 1302 (N.D.Fla.2012). Although legislative purpose may be a relevant' factor in a discriminatory intent challenge brought pursuant to the Federal Voting Rights Act, challenges under the federal statute primarily involve “effect” rather than “intent,” which is an easier standard to establish since it does not involve probing the motives behind the plan. See, e.g., Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). In addition, federal courts have long recognized the existence of a federal legislative privilege based on the explicit text of the Speech or Debate Clause of the United States Constitution and through federal common law — neither of which applies to an action in state court based on a specific prohibition in the state constitution.
Finally, in embracing the circuit court’s approach, we reject the argument propounded by the First District that the dichotomy between discoverable and non-discoverable information recognized by the circuit court is an unworkable test. See Romo, 113 So.3d at 121. To the contrary, we have confidence that the circuit court will be able to capably make these determinations on a situation-by-situation basis as the specific issues arise, as circuit courts are often called upon to do, and that the parties will conduct discovery in a good faith manner.
As to the procedure to determine whether the draft apportionment plans and supporting documents should be produced, we reject the First District’s reasoning and approve the circuit court’s approach. As the circuit court stated:
Florida has a long and rich tradition of open government and the case law in this area suggests that questions about *153 the interpretation of the Public Records Act should be resolved in favor of access by the public. Any specific exemptions are therefore to be strictly construed. Noting the legislative history of the exemption under which the [Legislature] seek[s] protection, I conclude that their very broad interpretation of the exemption is not supported by the language of the statute nor the case law in this area. The [challengers’] interpretation might be a little too narrow, as they suggest that once any plan has been passed, any documents that might have been exempted from the act, are no longer so.
It is difficult for me to know where to draw the line between the plan that was actually proposed and adopted by the legislature and any other draft of a plan. The [challengers’] argument is that the entire process is designed to create a plan, not several plans. Without having precise knowledge of how plans are proposed, discussed, and developed, it is difficult for me to evaluate that assertion. The only way I know how to do so is to have any disputed documents presented to me in camera, with explanatory testimony as to their nature and how they compare or contrast with the plan ultimately adopted.
We agree that the first issue to be decided is whether the draft plans fall within the scope of the public records exemption in section 11.0431(2)(e), Florida Statutes (2012), and that this exemption should be strictly construed in favor of disclosure. See Rameses, Inc. v. Demings, 29 So.3d 418, 421 (Fla. 5th DCA 2010) (“In light of the policy favoring disclosure, the Public Records Act is construed liberally in favor of openness, and exemptions from disclosure are construed narrowly and limited to their designated purpose.”). However, even if the circuit court concludes, after undertaking an in camera review of any disputed documents, that the draft plans are exempt from public records disclosure, the circuit court should still require the Legislature to produce the draft apportionment maps and supporting documents under appropriate litigation discovery rules, to the extent these documents do not contain information regarding individual legislators’ or legislative staff members’ thoughts or impressions. See Dep’t of High. Saf. & Motor Veh. v. Krejci Co., 570 So.2d 1322, 1325 (Fla. 2d DCA 1990) (determining that a statutory exemption from public records disclosure is not a per se bar to insulate records from discovery in a civil action); see also Fla. R. Civ. P. 1.280(b)(1) (“Parties may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter of the pending action_” (emphasis added)).
We emphasize that this case presents novel issues of law and the first circuit court litigation under the new article III, section 20(a), redistricting standards. Indeed, the specific claims raised by the challengers in this case are first of their kind claims under the Florida Constitution that require considerable factual development. See Apportionment III, 118 So.3d at 210. Given that the record at this time does not indicate that the challengers “have so much as framed the questions to be asked on deposition,” Romo, 113 So.3d at 130 (Benton, C.J., dissenting), the challengers should not be prevented from developing evidence to support their constitutional claims.
Although the dissent criticizes our approval of the dichotomy between discoverable and non-discoverable information as having no principled basis, we approve the distinction drawn in the well-reasoned order of the circuit court, recognizing that this order was entered in anticipation of the depositions being set and the types of questions that could be posed. As Chief *154 Judge Benton pointed out, “[a]ctually knowing what questions the litigants intended to ask could well shed an invaluable light on these important issues.” Id. at 138. Without the depositions having taken place and specific objections raised, this Court can rule only on issues that are before us.
While the Florida Constitution authorizes the Legislature to adopt redistricting plans, it places significant limitations on how the redistricting plans are drawn and therefore the power is vested in the courts to determine the constitutionality of those plans. Accordingly, for all these reasons, we conclude that the circuit court recognized the proper balance in determining what information is protected by the legislative privilege at this stage of the litigation and what information the challengers should be permitted to discover. Because we conclude that the circuit court committed no error of law in its order, we also necessarily conclude that the First District erred in granting certiorari review of that non-final order because the circuit court’s order did not depart from the essential requirements of law, a necessary prerequisite for granting certiorari relief. See Citizens Prop. Ins. Corp. v. San Perdido Ass’n, 104 So.3d 344, 351 (Fla.2012).
In sum, we hold that individual legislators may waive their privilege, or legislators and legislative staff members may assert a claim of legislative privilege at this stage of the litigation only as to any questions or documents revealing their thoughts or impressions or the thoughts or impressions shared with legislators by staff or other legislators, but may not refuse to testify or produce documents concerning any other information or communications pertaining to the 2012 reapportionment process. Further, we emphasize that the circuit court is not constrained by this opinion from considering, as discovery proceeds, how a specific piece of information protected by the privilege fits into the balancing approach embraced herein.
CONCLUSION
Based on the foregoing, we conclude that Florida law should recognize a legislative privilege, but that this privilege is not absolute in this case, where the violations alleged are of an explicit state constitutional provision prohibiting partisan political gerrymandering and improper discriminatory intent in redistricting. We further conclude that the circuit court determined the proper balance of interests by protecting the thoughts or impressions of individual legislators and legislative staff members at this stage of the litigation, but recognizing the compelling, competing interest in ensuring that the Legislature complies with the constitutional mandate regarding redistricting by permitting discovery of all other information and communications pertaining to the constitutional validity of the challenged apportionment plan. Accordingly, we quash the First District’s decision under review, approve the circuit court’s order, and remand for further proceedings in accordance with this opinion.
It is so ordered.
LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
LABARGA, J., concurs with an opinion in which LEWIS, J., concurs.
PERRY, J., concurs with an opinion in which QUINCE, J., concurs.
CANADY, J., dissents with an opinion in which POLSTON, C.J., concurs.

. Amendment 5 is now codified in article III, section 21, of the Florida Constitution. The standards in article III, section 20 — governing congressional reapportionment — and those in article III, section 21 — governing legislative reapportionment — are identical.

. Article III, section 21, provides as follows:
In establishing legislative district boundaries:
(a) No apportionment plan or district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and districts shall consist of contiguous territory.
*140 (b) Unless compliance with the standards in this subsection conflicts with the standards in subsection (a) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.
(c) The order in which the standards within subsections (a) and (b) of this section are set forth shall not be read to establish any priority of one standard over the other within that subsection.
Art. III, § 21, Fla. Const. The only difference between article III, section 21, and article III, section 20, is that article III, section 21, applies to legislative reapportionment, whereas article III, section 20, applies to congressional reapportionment. The substantive standards governing the Legislature’s discretion in redistricting are identical in the two provisions. See Apportionment I, 83 So.3d at 598 n. 1 ("Amendment 6 adopted identical standards for congressional redistricting.").

. The challengers collectively include the League of Women Voters of Florida, Common Cause Florida, named plaintiff Rene Romo, and ten other individually named plaintiffs.

. See art. IV, § 11, Fla. Const. (1865); see also U.S. Const, art. I, § 6, cl. 1.

. See Girardeau v. State, 403 So.2d 513, 515 n. 3 (Fla. 1st DCA 1981) ("Florida’s 1865 Constitution contained a speech and debate clause in language substantially similar to that found in the United States Constitution; however, the clause was omitted from the 1868, 1885, and the current (1968) Florida Constitutions.”).

.North Carolina is the other state. Forty-three states have a state constitutional Speech or Debate Clause and five other state constitutions contain an arrest exemption without explicitly conferring a speech or debate privilege. Many states have both provisions.

. See Swerdlow Lightspeed Mgmt. Co., 942 So.2d at 457 (“No Florida legislative testimonial privilege has been recognized in the Evidence Code, statutes, or Florida constitution.”).

. See Marshall v. Anderson, 459 So.2d 384, 387 (Fla. 3d DCA 1984) (stating that the adoption of section 90.501, Florida Statutes (1981), "abolishefd] all common-law privileges existing in Florida," making "the creation of privileges dependent upon legislative action or pursuant to the Supreme Court's rule-making power" (quoting Law Revision Council Note)).

. See art. II, § 3, Fla. Const.; Ala. Const, art. Ill, § 43; Ariz. Const, art. Ill; Ark. Const, art. IV, § 2; Colo. Const, art. Ill; Conn. Const, art. II; Ga. Const, art. I, § 2, ¶ III; Idaho Const, art. II, § 1; Ill. Const, art. II, § 1; Ind. Const, art. Ill, § 1; Iowa Const, art. Ill, § 1; Ky. Const. §§ 27, 28; La. Const, art. II, § 2; Me. Const, art. Ill, § 2; Md. Const. Deck of Rts. art. 8; Mass. Const, pt. I, art. XXX; Mich. Const, art. Ill, § 2; Minn. Const, art. Ill, § 1; Miss. Const, art. I, § 2; Mo. Const, art. II, § 1; Mont. Const, art. Ill, § 1; Neb. Const, art. II, § 1; Nev. Const, art. Ill, § 1; N.H. Const, pt. 1, art. 37; NJ. Const, art. Ill, ¶ 1; N.M. Const, art. Ill, § 1; N.C. Const, art. I, § 6; N.D. Const, art. XI, § 26; Okla. Const, art. IV, § 1; Or. Const, art. Ill, § 1; R.I. Const, art. V; S.C. Const, art. I, § 8; S.D. Const, art. II; Tenn. Const, art. II, § 2; Tex. Const, art. II, § 1; Utah Const, art. V, § 1; Vt. Const, ch. II, § 5; Va. Const, art. Ill, § 1; W. Va. Const, art. V, § 1; Wyo. Const, art. II, § 1.

. The amicus curiae brief from which this quotation is derived was filed by three former presiding officers of the Florida Legislature— former Senate Presidents Ken Pruitt and John M. McKay and former Speaker of the House James Harold Thompson — in support of the Legislature.

. This case does not involve legislative immunity, nor does it involve the liability of any individual legislator. We note that the legislative privilege (that is, an evidentiary privilege against compelled judicial process) is different than legislative immunity from suit, even though federal courts have held that the legislative privilege is derived from the principles underlying legislative immunity. See Gravel v. United States, 408 U.S. 606, 615, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972). These principles are based on the United States Constitution's Speech or Debate Clause, see U.S. Const. art. I, § 6, cl. 1, and arise out of "the Parliamentary struggles of the Sixteenth and Seventeenth Centuries.” Tenney v. Brandhove, 341 U.S. 367, 372, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).

. The number of e-mails — 16,000—was provided during oral argument by the attorney representing the Legislature.

. As an example, the former presiding officers assert in their amicus curiae brief that constituents will be less likely to bring difficult, emotional issues, such as issues relating to someone who has been the victim of a crime or a “glitch in Florida law” causing a businessperson to be unable to make ends meet, to the attention of their legislator without the protection of a dependable legislative privilege.

. See Apportionment I, 83 So.3d at 615 n. 19 (noting that California and Washington share a similar constitutional provision and Idaho, Iowa, Montana, and Oregon codify similar provisions by statute).